# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 20-37C
(Filed: January 31, 2020)*
*Opinion originally filed under seal on January 28, 2020

|  |  |  |
|---|---|---|
| QUALITY CONTROL INTERNATIONAL, LLC, | ) ) ) ) | Bid Protest; Post-Award; Preliminary Injunction |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| THE UNITED STATES, | ) ) ) | |
| Defendant, | ) ) ) | |
| and, | ) ) ) | |
| PHOENIX MANAGEMENT, INC., | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

*David A. Rose*, Valdosta, GA, for plaintiff.

*Kara M. Westercamp*, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Allison Kidd-Miller*, Assistant Director, for defendant. *Robert Schlattman*, Deputy General Counsel, General Services Administration, Denver, CO, of counsel.

*Johnathan M. Bailey*, San Antonio, TX, for defendant-intervenor.

## OPINION AND ORDER DENYING PRELIMINARY INJUNCTION

**FIRESTONE**, *Senior Judge*.

Pending before the court are the plaintiff's, Quality Control International, LLC ("QCI"), motions for a temporary restraining order ("TRO") (ECF No. 2) and preliminary injunction (ECF No. 3). QCI is the incumbent providing current maintenance services for the General Service Administration ("GSA") in Montana, and its contract is set to end on January 31, 2020. The subsequent contract for these maintenance services was awarded to Phoenix Management, Inc. ("PMI") on August 28, 2019. QCI was notified about the award on September 6, 2019. QCI protested the award in the Government Accountability Office ("GAO") on September 16, 2019, and the GAO denied QCI's protest of the award decision on December 20, 2019. On January 13, 2020, QCI filed a complaint in this court. QCI seeks a preliminary injunction to enjoin the GSA from proceeding with work awarded to PMI pending resolution of this action.

QCI argues that it is entitled to preliminary injunctive relief because QCI is likely to succeed on the merits by showing that but for the GSA's misleading discussions regarding QCI's price during the procurement, QCI would have had a substantial chance of being awarded the contract at issue. QCI further argues that QCI will suffer irreparable harm from the costs to mobilize and demobilize equipment for the contract, and that the balance of harms and public interest in awarding a lawful procurement weigh in favor of granting preliminary relief.

The defendant United States (the "government") and PMI filed oppositions (ECF Nos. 16, 17) to plaintiff's motions. The government and PMI argue that QCI is unlikely to succeed on the merits because, as the GAO found, GSA's discussions regarding pricing were consistent among offerors, accurate, and not misleading. The government

2

and PMI further argue that QCI has not shown that it will suffer irreparable harm, and neither the balance of the hardships nor the public interest weigh in favor of enjoining GSA from obtaining its required services from PMI.

For the reasons that follow, the court finds that QCI has not demonstrated that it is likely to succeed on the merits, that it will suffer irreparable harm, or that the balance of hardships or public interest weigh in favor of granting a preliminary injunction. The plaintiff's motion for a preliminary injunction is **DENIED**.[1]

## I.    FACTUAL BACKGROUND

The following facts are taken from the Administrative Record ("AR") filed on January 21, 2020 (ECF No. 20).

On May 1, 2018, GSA issued a request for proposals No. 47PJ0018R0027 ("RFP"). AR 1. The RFP was a small business set-aside and sought proposals to provide maintenance services for multiple GSA facilities in Montana. AR 1, 3. The RFP contemplated an award of a fixed-price contract, AR 20, and included a base period of one year and four one-year options, AR 3. In terms of evaluating offers, the RFP explained that award was to be made on a best-value tradeoff basis, with non-price factors, when combined, to be considered approximately equal to price. AR 220.

Regarding price, the RFP stated that prices "will be evaluated for low price, price reasonableness, price realism and balance." AR 222. Further, the "sum of the pricing . . .

---

[1] Because the court has addressed QCI's motion for a preliminary injunction prior to QCI's contract expiration, QCI's motion for a TRO is **DENIED AS MOOT**.

in the price proposal submitted by each offeror will be evaluated. Offerors whose prices are unbalanced, unreasonable, or unrealistic, may be rejected as unacceptable." *Id.*

On June 6, 2018, QCI timely submitted its first price proposal. AR 224. QCI's proposed overall price was $[. . . .]. AR 233. The GSA evaluated initial proposals. In evaluating QCI's price, GSA compared the overall price to the Internal Government Estimate ("IGE") of $[. . . .]. AR 438. GSA stated that QCI's "price appears to be borderline [. . . .]" and "[w]hen comparing the total costs between the IGE and offeror pricing, QCI's costs appear [. . . .]" because the proposed price was "[. . . .] than the IGE and [. . . .] lower than averaged offeror pricing." AR 440; *see* AR 488 (Source Selection Evaluation Board Recommendation for first round offers stating the same). The internal review further stated "[h]owever, QCI only has a few pricing elements that appear potentially [. . . .]." AR 440.

GSA decided to conduct discussions with the offerors. In conducting discussions with QCI, GSA noted that several pricing factors were unreasonably or unrealistically low. *See* AR 268. A letter was subsequently provided on June 10, 2018 to memorialize the discussion. AR 266. In connection to QCI's price, the letter stated:

- The mechanical level of effort at Bozeman, Butte, and Missoula appear [. . . .].
- The mechanical labor costs at Bozeman, Butte, and Missoula appear [. . . .].
- The mechanical direct costs (costs other than self-performed labor) appear [. . . .] at Billings, Bozeman, Butte, and Missoula.
- The offeror's price of $[. . . .][. . . .].
- The price proposal fails to include pricing for an administrative support position.
- The proposed markup rates, when combined, are [. . . .].

AR 268; *see* AR 440 (internal GSA review stating the same). The letter also provided that "any items raised by the Government during the discussions must be addressed in writing in QCI's revised proposal." AR 266.

Following the first round of discussions, QCI and other offerors submitted revised proposals. QCI's revised proposed price was $[. . . .]. AR 276. GSA evaluated the revised proposals. AR 494. Regarding price, GSA evaluated whether QCI's revised proposal improved on the previously identified weaknesses. AR 532-33. Regarding QCI's overall price, GSA stated that "[t]he majority of the price proposal increase is due to the increase level of effort for mechanical, grounds maintenance/snow removal and custodial" and that "QCI's proposal appears to have addressed our concerns about the [. . . .] of total price." AR 533. The only [. . . .] remaining was QCI's markup rate. *Id.*; *see* AR 546 (Source Selection Evaluation Board Recommendation stating the same); AR 552 (Source Selection Decision Document stating the same).

GSA decided to conduct another round of discussions with six offerors, AR 548, and a letter was subsequently provided on July 23, 2019 to memorialize those discussions with QCI, AR 309. The letter stated:

- QCI's markup rates remain [. . . .].
- QCI was also notified that it is not the Government's intention to conduct another round of discussions so offerors should submit their most competitive offer.

AR 310.

Following the final round of discussions, QCI and other offerors submitted final revised proposals. QCI's final proposed price was $[. . . .]. AR 317. GSA evaluated the

5

final revised proposals, AR 555, and determined that QCI's final revised price was consistent with the Government estimate and that the markup rates remained [. . . .], AR 572. However, GSA concluded that the markup rates were "not a weakness" despite raising GSA's costs by $[. . . .]. AR 597.

The Source Selection Evaluation Board recommended that award should be made to PMI with a final revised offer price of $7,138,087.25. AR 603. In comparison to QCI, the recommendation stated "[a]fter consideration [PMI's] strong staffing proposal, strong management proposal, and demonstration of experience on large, complex projects (also receiving favorable past performance), the Government is unable to justify paying a premium of $[. . . .] for QCI's lower technical proposal." AR 606.

Following review of the recommendation, the Contracting Officer ("CO") selected PMI. The CO stated that "the government is unable to justify paying any price premium for any of the [. . . .] offerors higher rating for experience/past performance when [PMI] submitted better staffing and management plans, and . . . has demonstrated successful performance on large, complex maintenance contracts." AR 614.

On September 6, 2019, QCI received a letter from the CO indicating that QCI's proposal had not been selected. AR 615. QCI was informed that the successful offeror, PMI, was only slightly better on technical factors than QCI and QCI's price was only slightly higher than PMI's price. *Id.*

QCI subsequently filed a protest with the GAO. Compl. ¶ 15. The GAO denied QCI's protest on December 20, 2019. *Id.* ¶ 16. The GAO stated:

Based upon our review of the record, we find that the agency's communications were not misleading or coercive. As described in detail above, the record demonstrates that, during discussions, the agency accurately raised its concerns regarding QCI's proposed price, and then simply asked QCI to address issues the agency had identified with respect to QCI's price proposal. For example, during the first round of discussions, the agency advised QCI that its overall price-- and some of its price elements--were unrealistically low, and informed QCI that "any items raised by the [g]overnment during the discussions must be addressed in writing in QCI's revised proposal." AR, Tab 6, Confirmation of Discussions (First Round), at 1, 3. After receipt of this information, QCI raised its price in its first revised proposal, before electing to lower its price in its FRP. COS/MOL at 3, 6.

First, QCI has not established that the information provided by the agency was inaccurate or communicated in bad faith. Additionally, QCI has not demonstrated that it was actually mandated, or required, to raise its price. Rather, the agency stated that the items discussed must be addressed, but not how they were to be addressed. The protester's argument that it was coerced by the agency to raise its price is not supported by the record. Instead, the record shows that QCI was free to propose any price it wished, so long as the agency's concerns were addressed in the revised proposal.

GAO Dec., B-417984 (ECF No. 12 at 4-5).[2]

QCI filed the instant protest on January 13, 2020. On January 17, 2020, the court held a status conference and set the case for expedited briefing for both the preliminary injunction and the merits with the final merits briefs due March 12, 2020. The

---

[2] "Although not binding on this court, GAO opinions are properly used for information and guidance, given the GAO's experience and expertise." *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 412 (2009) (quotation omitted).

Administrative Record was made available on January 21, 2020. QCI's motion for preliminary injunction was fully briefed on January 23, 2020. In light of the discussion at the January 17, 2020 status conference, the court finds that oral argument is not necessary.

## II.   LEGAL STANDARDS

The Tucker Act states that when reviewing bid protests the court may grant "any relief the court considers proper . . . including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). A preliminary injunction is recognized as a "drastic and extraordinary remedy that is not to be routinely granted." *Nat'l Steel Car. Ltd. v. Canadian Pac. Ry. Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quotation omitted). In order to obtain a preliminary injunction in the Federal Circuit, the movant must show: "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1345 (Fed. Cir. 2019) (citation omitted). "[T]he party seeking the injunction must be able to demonstrate that it has at least a fair chance of success on the merits for a preliminary injunction to be appropriate." *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (internal quotation marks and citation omitted).

## III.   ANALYSIS

### A.   QCI Is Unlikely to Succeed On The Merits

QCI complaint brings forward one claim: that GSA failed to have equal, meaningful, and detailed discussions. QCI alleges that the CO "misled" it regarding pricing. Compl. ¶¶ 19-20. Specifically, QCI argues that GSA coerced QCI into raising its prices by indicating that two of its "significant pricing elements were unrealistically low and unreasonable" and that those deficiencies "could render QCI's offer unacceptable." Pl.'s Reply at 3 (ECF No. 22).

The government and PMI respond that QCI's argument before the court is the same as the one properly rejected by the GAO. Specifically, they argue that QCI provides only a conclusory argument that GSA misled or coerced QCI. Def.'s Opp. at 6-8; PMI's Opp. at 13-14. To the extent that QCI claims that GSA misled QCI, the government argues that GSA's discussions were consistent with their reasoned judgment and the available IGE for the project. *See* Def.'s Opp. at 7-8. To the extent that QCI argues that GSA coerced QCI, the government and PMI contend that GSA's statement that "all mentioned deficiencies had to be addressed" is not a command and that QCI could have kept its [. . . .] price and explained why it was not [. . . .].  *See* Def.'s Opp. at 8; PMI's Opp. at 14-15.

To obtain a preliminary injunction, QCI must show a likelihood of success on the merits of its bid protest claim. In a bid protest, the court reviews an agency's procurement actions under the rational-basis standard established under the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). As such, QCI must show GSA's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345,

9

1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.

Thus, QCI must show that GSA's statements during discussions were arbitrary, capricious, or an abuse of discretion because GSA either misled QCI or coerced QCI into raising its price.[3] "Discussions are misleading when a procuring agency issues incorrect, confusing[,] or ambiguous communications that misdirect an offeror attempting to revise its proposal." *CEdge Software Consultants, LLC v. United States*, 117 Fed. Cl. 419, 434-35 (2014) (internal quotation marks and citation omitted). Moreover, discussions are not coercive where the record demonstrates that an offeror was free to make any adjustment to its proposal, and voluntarily adjusted its proposal in response to an agency's concerns. *See CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 439-40 (2016).

Applying the above standards, the court agrees with the government and PMI that QCI has not demonstrated a likelihood of success on the merits. QCI's argument that

---

[3] FAR § 15.306(d) states that once an agency decides that discussions will be held, the agency is generally required to conduct "meaningful" discussions with all responsible offerors that submit proposals within the competitive range. The CO must at least indicate "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." *Id.* § 15.306(d)(3). Additionally, the CO cannot "engage in conduct that . . . [f]avors one offeror over another." *Id.* § 15.306(e). However, an agency is not "obliged to advise [an offeror] that its price was higher than those of its competitors. *Lyon Shipyard, Inc. v. United* States, 113 Fed. Cl. 347, 356 (2013). *See Standard Comms., Inc. v. United States*, 101 Fed. Cl. 723, 740 (2011) (the meaningfulness requirement "does not mean that an agency must spoon-feed an offeror as to each and every item that must be revised, added or otherwise addressed to improve a proposal") (quotation omitted).

GSA either misled or coerced QCI lacks support. First, the court finds no record support for QCI's argument that GSA's discussions were misleading. The record demonstrates that GSA had concerns regarding QCI's initial proposed price, and GSA articulated those same concerns to QCI. AR 440, 488, 268. As the GAO determined, the concerns conveyed to QCI were not inaccurate or made in bad faith. Moreover, QCI has not shown that those concerns were arbitrary, capricious, or an abuse of discretion. Rather, the record shows that GSA rationally based its pricing concerns by considering the available IGE for the project and the average price proposed by other offerors. AR 440.

In addition, QCI has not shown that GSA's discussions were coercive. QCI argues that GSA's statement that QCI's significant price deficiencies could render QCI's offer unacceptable was coercive. Compl. ¶¶ 13-14. Yet, the record demonstrates that GSA's statement was consistent with the RFP, which indicated that "[o]fferors whose prices are unbalanced, unreasonable, or unrealistic, may be rejected as unacceptable." AR 222. It was not unreasonable for GSA to identify what it considered to be a significant weakness and inform QCI as to how the weakness could be treated under the RFP.

The court further agrees with PMI that GSA's instruction to QCI to "address" pricing concerns is not the equivalent to a mandate that QCI's pricing be raised by a particular amount. *See* PMI's Opp. at 14. Rather, GSA identified what GSA considered to be a significant weakness in QCI's price and gave QCI the opportunity to address GSA's concerns. Far from coercion, the record shows that QCI was free to propose any price it wished in its revised proposal. *See* AR 266. Indeed, the record shows that QCI elected to lower its price in the final revised proposal. AR 276, 317. GSA did not know how QCI

11

would address its price issue or what the final pricing would be by other offerors. Thus, QCI has not shown that GSA's discussions with QCI were coercive.

### B.      QCI Has Not Shown Irreparable Harm

QCI alleges that absent preliminary injunctive relief, it will suffer irreparable harm from a loss of potential profits and the inability to "further offset[] the substantial cost already incurred to mobilize [under the existing contract] and the cost it will incur to demobilize." Pl.'s Mot. at 8-9 (ECF No. 4). In addition, QCI argues that it may lose employees from its current contract, and if successful on the merits, QCI would have difficulty rehiring those individuals. Pl.'s Reply at 4.

The government and PMI argue that QCI's allegation of potential lost profits, mobilization costs, and risk of losing employees is insufficient to demonstrate irreparable harm. Def.'s Opp. at 8-9; PMI's Opp. at 7-8. In addition, the government argues that if the court enjoins award to PMI, GSA "would be required to award a separate bridge contract" but "QCI has no legitimate expectation of receiving *any* further sole-source or bridge contracts during the pendency of *this* protest." Def.'s Opp. at 9 (citing *Bannum, Inc. v. United States*, 121 Fed. Cl. 543, 551 (2015) ("It appears that the predicate for plaintiff's argument is its sense of entitlement to a fourth bridge contract.")).

"To demonstrate an irreparable injury, a plaintiff must show that without a preliminary injunction or TRO it will suffer irreparable harm before a decision can be rendered on the merits." *Munilla Constr. Mgmt, LLC v. United States*, 130 Fed. Cl. 131, 136 (2016) (quoting *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001)). The court finds that QCI has not done so here. First, as the government argues, QCI has no

legitimate expectation of receiving an additional bridge contract during this protest. Even with an injunction, therefore, it is not evident that QCI's alleged irreparable injury will be cured. Second, the "the loss of personnel by an incumbent contractor during a transition period generally does not constitute irreparable injury." *Munilla*, 130 Fed. Cl. at 137 (citing cases). Third, the mobilization and demobilization costs are also "the sorts of things that any incumbent would experience upon the loss of a contract" and do not constitute irreparable harm. *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 26 (2012).

Finally, although "the lost opportunity to fairly compete for an award, and the resulting lost profits, generally qualify as irreparable harm," *see Global Dynamics, LLC v. United States*, 138 Fed. Cl. 207, 209 (2018), QCI's concerns about the loss of potential profits are unpersuasive here because QCI waited twenty-three days after the GAO's decision to file its protest. As discussed above, the GAO denied QCI's protest on December 20, 2019, and QCI filed its complaint in this case on January 13, 2020. Although QCI's counsel argues that the delay is justified given the timing of the GAO's decision with the winter holidays, the court finds the length of the delay here undercuts QCI's argument, given that QCI was well aware that its already extended contract would expire January 31, 2020.  "Equity aids the vigilant, not those who slumber on their rights." *Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 210 (2012); *see also Software Testing Sols., Inc. v. United States*, 58 Fed. Cl. 533, 537 (2003). Moreover, the "strength or weakness of [the protestor's] merits arguments largely determines the court's view of irreparable injury."  *Akal Sec., Inc. v. United States*, 87

Fed. Cl. 311, 319-20 (2009); *see also Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 693 (2018) ("Further, irreparable harm to plaintiff is not established because the protestor has not shown likelihood of success on the merits."). In this case, as discussed above, QCI has failed to establish a likelihood of success on the merits. For the forgoing reasons, the court finds that QCI has also failed to demonstrate irreparable harm absent a preliminary injunction.

### C. The Balance Of Hardships Weighs Against Preliminary Injunctive Relief

Moreover, the court finds that any economic harm QCI would suffer is outweighed by the harm to the government and PMI. "The court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendant and on defendant-intervenor." *Akal Sec.*, 87 Fed. Cl. at 320. As the government argues, because QCI's contract ends on January 31, 2020 and no additional contract is in place, "GSA will need to scramble to obtain approval for and execute a bridge contract during the duration of this protest" which would likely be at "an unfavorable cost . . . as compared to PMI's cost." Def.'s Opp. at 9-10. In addition, PMI argues that it will suffer the same harms QCI alleges if the motion for a preliminary injunction is granted. PMI's Opp. at 7. Finally, as noted above, the court has determined that most of the economic harms alleged by QCI do not constitute irreparable harm, and QCI's delay weighs in favor of the government on the balance of hardships factor. *See Team Waste*, 135 Fed. Cl. at 693. The court finds, therefore, that the balance of hardships weighs against granting preliminary injunctive relief.

### D.    The Public Interest Weighs Against Preliminary Injunctive Relief

QCI argues that there is a strong public interest in having transparent and fair procurements. QCI's Reply at 5 (ECF No. 22). In this connection, QCI argues that because it alleges an error "involving discussions (a sensitive topic)," the public interest weighs in QCI's favor. *Id.* at 6. The government and PMI respond that because QCI has not presented a claim likely to succeed on the merits, QCI also has not shown that the public interest is served by delaying the award to PMI. Def.'s Opp. at 10; PMI's Opp. at 10-11. PMI further argues that there is a public interest in procurements "be[ing] conducted without excessive judicial interference." PMI's Opp. at 11 (quotation omitted).

The court agrees with the general proposition that the public interest is served by ensuring that the government complies with procurement regulations. However, as discussed above, QCI has not shown that it is likely to succeed on the merits of its argument that GSA's actions failed to conform with applicable procurement regulations. *See Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 101 (Fed. Cir. 2014) (agreeing with the lower court that "no strong public interest was demonstrated" in that case when the movant had failed to show likelihood of success on the merits). The court also agrees with PMI that the public interest is better served by refraining from granting a preliminary injunction absent a legally compelling reason. *See State v. United States*, 144 Fed. Cl. 263, 276-77 (2019) (noting that a "procuring agency should be able to conduct procurements without excessive infringement up on the agency's discretion") (quotation and citation omitted)).  The court finds no legally compelling reason to enjoin award to PMI at this juncture.

**IV.     CONCLUSION**

For the forgoing reasons, QCI has failed to demonstrate a likelihood of success on the merits, irreparable harm, and that the balance hardships or public interest weigh in favor of granting a preliminary injunction. As such, the QCI's motion preliminary injunction (ECF No. 3) is **DENIED**. Further, QCI's motion for a TRO (ECF No. 2) is **DENIED AS MOOT**.

     **IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge