# In the United States Court of Federal Claims

No. 20-37C
(Filed: May 29, 2020)
Opinion originally filed under seal May 20, 2020

| | |
|---|---|
| QUALITY CONTROL INTERNATIONAL, LLC, | Bid Protest; Post-Award; FAR 15.306; Cross Motions for Judgment on the Administrative Record; Meaningful Discussions |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant, | |
| and, | |
| PHOENIX MANAGEMENT, INC., | |
| Defendant-Intervenor. | |

*David A. Rose*, Valdosta, GA, for plaintiff.

*Kara M. Westercamp*, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Allison Kidd-Miller*, Assistant Director, for defendant. *Robert Schlattman*, Deputy General Counsel, General Services Administration, Denver, CO, of counsel.

*Johnathan M. Bailey*, San Antonio, TX, for defendant-intervenor.

## OPINION

**FIRESTONE**, *Senior Judge*.

This post-award bid protest involves the General Services Administration's

("GSA") contract award for maintenance services in Montana to the defendant-intervenor

Phoenix Management, Inc. ("PMI") issued on August 29, 2019. The plaintiff, Quality Control International, LLC ("QCI") had been the incumbent who provided the maintenance services under a prior contract until January 31, 2020. On January 13, 2020, QCI filed this action challenging the award to PMI together with a motion for a temporary restraining order ("TRO") and preliminary injunction ("PI"). On January 28, 2020, the court denied QCI's motions for a TRO and PI. (ECF No. 23). Now pending are the parties' cross-motions for judgment on the administrative record.

In its protest, QCI has focused its challenge on the discussions GSA conducted with QCI during the procurement process. QCI argues that but for GSA's misleading discussions regarding QCI's price, QCI would not have raised its price and would have had a substantial chance of being awarded the contract at issue. QCI alleges that GSA misled QCI by improperly coercing QCI to increase its price and raising price concerns based on an inaccurate Internal Government Estimate ("IGE").

Defendant the United States (the "government") and PMI argue that GSA's discussions with QCI were proper because GSA did not mandate that QCI raise its price. They also argue that GSA rationally relied on the IGE to identify GSA's concerns with QCI's proposed price. In addition, PMI argues that its pricing was consistently lower than QCI's pricing in any event and that it too was told by GSA that PMI's initial price appeared too low based on the same IGE. For this reason, PMI argues that QCI has failed to demonstrate that it was prejudiced by GSA's discussions regarding price.

For the reasons that follow, the government and PMI's cross-motions for judgment on the administrative record are **GRANTED**. QCI's motion for judgment on the administrative record is **DENIED**.

## I.  FACTUAL BACKGROUND

The following facts are taken from the Administrative Record ("AR") filed on January 21, 2020 (ECF No. 20).

On May 1, 2018, GSA issued request for proposals No. 47PJ0018R0027 ("RFP"). AR 1. The RFP was a small business set-aside and sought proposals to provide maintenance services for multiple GSA facilities in Billings, Bozeman, Butte, and Missoula Montana. AR 1, 3. The RFP contemplated an award of a fixed-price contract, AR 20, and included a base period of one year with four one-year options, AR 3. Regarding the evaluation of offers, the RFP explained that award would be made on a best-value tradeoff basis, with non-price factors, when combined, to be considered approximately equal to price. AR 220.

Regarding price, the RFP stated that prices "will be evaluated for low price, price reasonableness, price realism and balance." AR 222. Further, the "sum of the pricing . . . in the price proposal submitted by each offeror will be evaluated. Offerors whose prices are unbalanced, unreasonable, or unrealistic, may be rejected as unacceptable." *Id.*

On June 6, 2018, QCI timely submitted its first price proposal. AR 224. QCI's proposed overall price was $6,009,580.00. AR 233. In evaluating QCI's price, GSA compared QCI's overall price to the IGE of $7,398,875.39. AR 438. GSA stated that QCI's "price appears to be borderline unrealistic" and "[w]hen comparing the total costs

between the IGE and offeror pricing, QCI's costs appear unrealistically low" because the proposed price was "19% lower than the IGE and 16% lower than averaged offeror pricing." AR 440; s*ee* AR 488 (Source Selection Evaluation Board Recommendation for first round offers stating the same). The internal review further stated "[h]owever, QCI only has a few pricing elements that appear potentially unrealistic." AR 440.

GSA decided to conduct discussions with the offerors. In conducting discussions with QCI, GSA noted that several pricing factors appeared to be unreasonably or unrealistically low. *See* AR 268. A letter was subsequently provided to QCI on June 10, 2019 to memorialize the discussion. AR 266. In connection to QCI's price, the letter stated:

- The mechanical labor costs at Bozeman, Butte, and Missoula appear significantly low.
- The mechanical direct costs (costs other than self-performed labor) appear significantly low at Billings, Bozeman, Butte, and Missoula.
- The offeror's price of $6,009,580.00 does not appear realistic.
- The price proposal fails to include pricing for an administrative support position.
- The proposed markup rates, when combined, are significantly high.

AR 268; *see* AR 440 (internal GSA review stating the same). The letter also provided that "any items raised by the Government during the discussions must be addressed in writing in QCI's revised proposal." AR 266.

A comparison of the specific costs with the IGE and GSA's discussions with QCI shows:

| **GSA'S INITIAL PRICE DISCUSSIONS WITH QCI** | | **IGE** | **QCI Initial Price** |
|---|---|---|---|
| Mechanical labor costs at Bozeman, Butte and Missoula appear significantly low | Bozeman | $115,440.00 | $[. . .] |
| | Butte | $115,440.00 | $[. . .] |
| | Missoula | $115,440.00 | $[. . .] |
| Mechanical direct costs (costs other than self-performed labor) appear significantly low at Billings, Bozeman, Butte and Missoula | Billings | $76,000.00 | $[. . .] |
| | Bozeman | $77,000.00 | $[. . .] |
| | Butte | $77,000.00 | $[. . .] |
| | Missoula | $82,000.00 | $[. . .] |
| The offeror's price of 6,009,580.00 does not appear realistic | | $7,398,875.39 | $6,009,580.00 |

AR 610.

PMI's initial proposed price was $5,739,665.88. AR 610. The letter memorializing GSA's discussions with PMI stated:

- The grounds maintenance/snow removal costs at all locations appear significantly low.
- The mechanical direct costs (costs other than self-performed labor) appear significantly low at the Butte and Missoula locations.
- The profit and markup rates of 16% when combined appear significantly high.
- The offeror's price of $5,739,665.88 appears unrealistically low.

AR 321. It further stated, "any items raised by the Government during the discussions must be addressed in writing in Phoenix Management's revised proposal." AR 320.

A comparison of the specific costs with the IGE and GSA's discussions with PMI shows:

| **GSA'S INITIAL PRICE DISCUSSIONS WITH PMI** | | **IGE** | **PMI Initial Price** |
|---|---|---|---|
| The mechanical direct costs (costs other than self-performed labor) appear significantly low at the Butte and Missoula locations. | Billings | $76,000.00 | $[. . .] |
| | Bozeman | $77,000.00 | $[. . .] |
| | Butte | $77,000.00 | $[. . .] |
| | Missoula | $82,000.00 | $[. . .] |
| The offeror's price of $5,739,665.88 appears unrealistically low. | | $7,398,875.39 | $5,739,665.88 |

AR 610.

Following the first round of discussions, QCI and other offerors submitted revised proposals. QCI revised its price proposal upward to $7,461,340.00. AR 276. PMI revised its price proposal upward to $7,295,306.57. AR 610. GSA evaluated the revised proposals. AR 494. Regarding price, GSA evaluated whether QCI's revised proposal improved on the previously identified weaknesses. AR 532-33. Regarding QCI's overall price, GSA stated that "[t]he majority of the price proposal increase is due to the increase level of effort for mechanical, grounds maintenance/snow removal and custodial" and that "QCI's proposal appears to have addressed our concerns about the low level of total price." AR 533. The only significant weakness remaining was QCI's markup rate. *Id.*; *see* AR 546 (Source Selection Evaluation Board Recommendation stating the same); AR 552 (Source Selection Decision Document stating the same).

Regarding PMI's overall price following the first round of discussions, GSA wrote "[PMI's] revised price has been increased from $5,739,665.88 to $7,295,306.57. The

majority of the price proposal increase is due to the increase level of effort for mechanical, grounds maintenance/snow removal and custodial." AR 525. GSA further stated that "[a]fter the level of effort adjustments [PMI's] proposal appears reasonable, realistic and balanced." *Id.* Although the mechanical direct costs at Butte and Missoula "still appear[ed] low" on the revised price, GSA stated that the prices were "not so significantly low that it increases the risk to the Government considering [PMI's] overall price . . . appears reasonable, realistic and balanced." *Id.*

GSA decided to conduct another round of discussions with six offerors, AR 548, and on July 23, 2019, GSA sent a letter memorizing the discussions to QCI and PMI. The letter to QCI stated:

- QCI's markup rates remain high.
- QCI was also notified that it is not the Government's intention to conduct another round of discussions so offerors should submit their most competitive offer.

AR 310.  The letter to PMI stated:

- The mechanical direct costs for Butte and Missoula appear slightly low.
- When combined, the grounds maintenance and snow removal costs appear significantly high at the Billings and Bozeman locations.
- [PMI] was also notified that it is not the Government's intention to conduct another round of discussions so offerors should submit their most competitive price offer.

AR 324.

Following the final round of discussions, QCI and PMI together with other offerors submitted final revised proposals. QCI's final proposed price was $7,247,080.00. AR 610. PMI's final proposed price was $7,138,087.25. *Id.* GSA evaluated the final revised proposals, AR 555, and determined that QCI's final revised price was consistent

with the IGE but that the markup rates remained high, AR 572. GSA concluded, however, that the markup rates were "not a weakness" despite raising GSA's costs by $180,000. AR 597.

Regarding PMI's final price proposal, the GSA evaluators identified "no significance weaknesses or deficiencies . . . with [PMI's] price proposal." AR 591. GSA further stated "[PMI's] price is in line with both the Government's estimate as well as comparable (but slightly lower) to other offeror's pricing." AR 591-92. The "[c]osts for labor, materials, equipment, subcontracts and markups" were found "realistic, reasonable and balanced." AR 592.

The Source Selection Evaluation Board ("SSEB") recommended that award should be made to PMI with a final revised offer price of $7,138,087.25. AR 603. In recommending PMI receive the award ahead of QCI, the SSEB stated, "[a]fter considering [PMI's] strong staffing proposal, strong management proposal, and demonstration of experience on large, complex projects (also receiving favorable past performance), the Government is unable to justify paying a premium of $108,992.75 for QCI's lower technical proposal." AR 606. QCI has not challenged PMI's higher technical rating in this protest.

Following review of the SSEB's recommendation, the Contracting Officer ("CO") selected PMI. The CO stated that "the government is unable to justify paying any price premium for any of the three offerors' higher rating for experience/past performance when [PMI] submitted better staffing and management plans, and . . . has demonstrated successful performance on large, complex maintenance contracts." AR 614.

On September 6, 2019, QCI received a letter from the CO indicating that QCI's proposal had not been selected. AR 615. QCI was informed that the successful offeror, PMI, was only slightly better on technical factors than QCI and QCI's price was only slightly higher than PMI's price. *Id.*

QCI subsequently filed a protest with the GAO. *See* Compl. ¶ 15. Before the GAO, QCI claimed that GSA's discussions were misleading and coercive. The GAO denied QCI's protest on December 20, 2019. *Id.* ¶ 16. The GAO stated:

> Based upon our review of the record, we find that the agency's communications were not misleading or coercive. As described in detail above, the record demonstrates that, during discussions, the agency accurately raised its concerns regarding QCI's proposed price, and then simply asked QCI to address issues the agency had identified with respect to QCI's price proposal. For example, during the first round of discussions, the agency advised QCI that its overall price-- and some of its price elements--were unrealistically low, and informed QCI that "any items raised by the [g]overnment during the discussions must be addressed in writing in QCI's revised proposal." AR, Tab 6, Confirmation of Discussions (First Round), at 1, 3. After receipt of this information, QCI raised its price in its first revised proposal, before electing to lower its price in its FRP. COS/MOL at 3, 6.
>
> First, QCI has not established that the information provided by the agency was inaccurate or communicated in bad faith. Additionally, QCI has not demonstrated that it was actually mandated, or required, to raise its price. Rather, the agency stated that the items discussed must be addressed, but not how they were to be addressed. The protester's argument that it was coerced by the agency to raise its price is not supported by the record. Instead, the record shows that QCI was free to propose any price it wished, so long as the agency's concerns were addressed in the revised proposal.

GAO Dec., B-417984 (ECF No. 12 at 4-5).[1]

## II.   PROCEDURAL HISTORY

QCI filed the instant protest on January 13, 2020. QCI's motions for a TRO and PI were fully briefed on January 23, 2020. The court denied QCI's motions for a TRO and PI on January 28, 2020. *Quality Control Int'l, LLC v. United States*, 147 Fed. Cl. 193 (2020). The court found that the "record demonstrates that GSA had concerns regarding QCI's initial proposed price, and GSA articulated those same concerns to QCI." *Id.* at 199. The court also found that GSA's discussions with QCI were not coercive. *Id.* ("GSA identified what GSA considered to be a significant weakness in QCI's price and gave QCI the opportunity to address GSA's concerns. Far from coercion, the record shows that QCI was free to propose any price it wished in its revised proposal.").

Following the court's order on the motions for a TRO and PI, the parties filed cross-motions for judgment on the administrative record. QCI's Mot. for J. on the Admin. R. ("MJAR") (ECF No. 28); Def.'s Cross-Mot. for J. on the Admin. R. ("Def.'s MJAR") (ECF No. 31); PMI's Cross-Mot. for J. on the Admin. R. ("PMI's MJAR") (ECF No. 32). Briefing on these motions was completed on March 27, 2020. Oral argument was heard on May 14, 2020.

---

[1] "Although not binding on this court, GAO opinions are properly used for information and guidance, given the GAO's experience and expertise." *Global Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 350, 412 (2009) (quotation omitted).

## III.    LEGAL STANDARDS

The court reviews a bid protest to determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *WellPoint Military Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (internal quotation marks and citation omitted). In deciding whether the procurement agency acted rationally, the court applies the arbitrary, capricious, an abuse of discretion standard. *See id.* The arbitrary and capricious standard is "highly deferential" and the "protestor bears the burden of proving that a significant error marred the procurement in question." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (internal quotation marks and citation omitted). Pursuant to this standard, an agency's procurement decisions are entitled to a "presumption of regularity" and "the agency's action must be upheld as long as a rational basis is articulated, and relevant factors are considered." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (citations omitted).

"Importantly, the APA requires that 'due account shall be taken of the rule of prejudicial error.'" *WellPoint Military Care Corp.*, 953 F.3d at 1377 (quoting 5 U.S.C. § 706). Therefore, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *Id.* (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). In other words, the "protestor must show that but for that error, the protestor had a substantial chance of receiving a contract

award." *Office Design Grp. v. United States*, 951 F.3d 1366, 1373-74 (Fed. Cir. 2020).

"Prejudice is a question of fact." *Id.* at 1374.

## IV.   DISCUSSION

QCI argues that GSA acted arbitrarily, capriciously, and not in accordance with

the FAR by failing to have meaningful discussions and instead coercing or misleading

QCI to raise its proposed price. *See* QCI's MJAR at 10-11. QCI contends that GSA

engaged in misleading discussions because GSA (1) improperly coerced QCI to raise

proposed prices during the first round of discussions or face elimination from the

competition and (2) arbitrarily and capriciously relied on the IGE during the discussions.

QCI's MJAR at 12-13.

FAR § 15.306 provides the standards for agency exchanges with offerors after

receipt of proposals. FAR § 15.306(d) states that once an agency decides that discussions

will be held, the agency is generally required to conduct meaningful discussions with all

responsible offerors that submit proposals within the competitive range that "maximize

the [g]overnment's ability to obtain best value."  Discussions are meaningful where they

"generally lead offerors into the areas of their proposals requiring amplification or

correction." *D & S Consultants, Inc. v. United* States, 101 Fed. Cl. 23, 40 (2011) (quoting

*Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003)). The agency

must at least indicate "deficiencies, significant weaknesses, and adverse past performance

information to which the offeror has not yet had an opportunity to respond." FAR

§ 15.306(d)(3). However, the agency has no obligation to instruct the offeror "how to

rewrite its proposal" to address the proposal's deficiencies. *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 612-613 (2006).

Courts have addressed circumstances where discussions are not meaningful because the discussions are misleading. *See Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017). An agency misleads an offeror when the discussion leads the offeror "into responding in a manner that does not address the agency's concerns" or the discussion "misinforms the offeror concerning its proposal weaknesses or deficiencies." *D & S Consultants, Inc.*, 101 Fed. Cl. at 41 (quoting *Analytical & Res. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 48 (1997)). *See CEdge Software Consultants, LLC v. United States*, 117 Fed. Cl. 419, 434-35 (2014) ("Discussions are misleading when a procuring agency issues 'incorrect, confusing[,] or ambiguous' communications that misdirect an offeror attempting to revise its proposal.") (alteration in original and citation omitted).

Relevant to this protest, where the agency discussion coerces the offeror to present a particular price that prejudices the offeror, the discussion is considered misleading. *SRS Techs.*, B-254425.2, 94-2 CPD ¶ 125, 1994 WL 576118 at *2-4 (Sept. 14, 1995). However, discussions are not coercive where the record demonstrates that an offeror was free to make any adjustment to its proposal, and voluntarily adjusted its proposal in response to an agency's concerns. *See CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 439-40 (2016). In addition, where the agency prejudicially conveys or relies on incorrect information in the discussions, the discussions are also misleading. *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 45-46 (2016). Thus, if an IGE is incorrect,

it could result in misleading discussions. *See First Enter. v. United States*, 61 Fed. Cl. 109, 120 (2004).

A.     **GSA Did Not Coerce QCI to Raise Its Price.**

The court finds that QCI's contention that GSA engaged in misleading discussions on the grounds that GSA coerced QCI to raise its proposed price is not supported. As discussed above, during the first round of discussions GSA explained in writing to QCI that it "appeared" that some of QCI's prices were significantly low and that QCI's total proposed price did not appear realistic. GSA also stated in its letter to QCI that "any item raised by the Government during discussions must be addressed in writing in QCI's revised proposal." AR 266-67.

QCI asserts that these statements taken together amounted to a "mandate" to QCI to raise its price. QCI's MJAR at 10-13. In this connection, QCI argues that if QCI had an option to explain its prices, GSA should have explicitly stated that QCI "could reasonably explain the low prices and provide proof of its costs and reasoning for its low price." *Id.* at 14.

The government and PMI respond that GSA's statements to QCI did not amount to coercion. Rather, consistent with the FAR, GSA's statements merely put QCI on notice of the problems GSA had identified. The government and PMI argue that GSA then properly asked QCI to address those concerns without dictating any specific outcome. The government and PMI contend that the record shows that GSA in its letter to QCI did not mandate that QCI raise its price. Def.'s MJAR at 11; *see* PMI's MJAR at 8-9.

14

The question before the court is whether GSA's instruction to QCI to "address" pricing concerns coerced QCI to raise its prices. The court, like the GAO, finds that the answer is no. As discussed above, an agency does not coerce an offeror to take specific action simply by identifying a flaw in the offeror's proposal and stating that if the flaw is not addressed the offeror may not be eligible for award. This court and the GAO when faced with similar contentions have consistently held that, so long as the offeror has discretion as to how to respond to the government's concern, there is no coercion. *See CSC Gov't Sols.*, 129 Fed. Cl. at 439-440 ("CSC cannot reasonably argue that it was coerced . . . [where] it chose to acknowledge the . . . concerns raised in [the agency's] notice, and raised its costs"). For example, in *Global Dynamics, LLC v. United States*, 130 Fed. Cl. 211, 213-16 (2016), the court concluded that where an offeror was told that its "total proposed price appear[ed] low when compared to all other offerors in the competitive range" and was instructed to "review [its] total proposed price," the offeror was not improperly "instructed to raise its price." *Id*. Similarly, in another case, the GAO found "no merit to [the] argument" that the Navy mandated that an offeror raise its prices where the Navy stated that the prices "appear to be priced somewhat lower than the government estimate" and "advised [the offeror] to carefully review [its] price proposal for any misunderstanding of the requirement." *ITW Military GSE*, B-403866.3, Dec. 7, 2010, 2010 CPD ¶ 282, 2010 WL 4968775 at *3 ("This did not compel ITW to take any particular action, but left to the firm's business judgment whether it should raise its prices or explain the prices earlier submitted.").  In both of these cases, the offeror retained discretion regarding how to respond to the concerns identified by the government.

In contrast, only where an agency informs an offeror that it must take a specific action is the offeror's discretion improperly constrained. For example, in *SRS Techs.*, the GAO stated that where the agency required that government-estimated equipment costs "should be proposed as stated without any discounting," the offeror was improperly required "to use the government's equipment costs estimate for its proposed equipment costs." *SRS Techs.*, B-254425.2, 94-2 CPD ¶ 125, 1994 WL 576118 at *2-4 (Sept. 14, 1995). The GAO therefore found that, because the offeror was required to take a specific action, the offeror was improperly coerced during discussions.

Here, the record demonstrates that GSA's statements requiring QCI to address pricing concerns did not impermissibly limit QCI's ability to exercise its own business judgment in responding to those concerns. Unlike the protestor in *SRS Techs.*, QCI was not required to submit its next proposal at a particular price. Rather, GSA merely required QCI to "address" the prices that "appeared" low or unrealistic. Like the government's statements that the offerors in *Global Dynamics* and *ITW Military GSE* review any prices that appeared too low, GSA's statements here do not amount to a mandate to raise prices or offer a particular price. To the contrary, GSA's discussion letter to QCI avoided any conclusive determinations regarding an acceptable price.  Instead, the letter merely stated that QCI's prices "appeared" low or unrealistic. AR 268. The record demonstrates that GSA did not require QCI to take any specific action.

Furthermore, QCI's assertion that it was coerced into raising its price because GSA failed to tell QCI that it could provide more explanation or proof in support of its initial price is without support. As discussed above, GSA was not required to explain to

16

QCI exactly how GSA's concerns could be met under FAR 15.306. *See Fort Carson Support Servs.*, 71 Fed. Cl. at 612-613. Instead, GSA meets its obligation to conduct meaningful discussions under the FAR by "apprising [an offeror] of deficiencies in its proposal." *See D&S Consultants, Inc.*, 101 Fed. Cl. at 40-41. The language used in the discussions left QCI with the option to explain why the prices were not actually low or unrealistic, rather than raising its prices. QCI was free to "make any adjustment to its [proposed price] or none at all, based on its assessment of the validity of the [GSA's] concerns." *See Innovative Test Asset Sols. LLC v. United States*, 125 Fed. Cl. 201, 226 (2016).

For these reasons, QCI's claim of misleading discussions based on its proposed price being coerced fails, and the court denies QCI's motion for judgment on the administrative record with regard to this issue.

**B.    QCI's Claim that GSA's Reliance on the IGE Led to Misleading Discussions Is Not Supported.**

The court further concludes that GSA's discussions were not misleading based upon GSA's reliance on the IGE. QCI claims that GSA compared QCI's prices with an unsupported IGE which led to an erroneous discussion regarding QCI's prices. As discussed above, QCI's proposal as compared to the IGE broke down as follows:

| **GSA'S INITIAL DISCUSSIONS WITH QCI** | | **IGE** | **QCI Initial Price** |
|---|---|---|---|
| Mechanical labor costs at Bozeman, Butte and Missoula appear significantly low | Bozeman | $115,440.00 | $[. . .] |
| | Butte | $115,440.00 | $[. . .] |
| | Missoula | $115,440.00 | $[. . .] |
| Mechanical direct costs (costs other than self-performed labor) appear significantly low at Billings, Bozeman, Butte and Missoula | Billings | $76,000.00 | $[. . .] |
| | Bozeman | $77,000.00 | $[. . .] |
| | Butte | $77,000.00 | $[. . .] |
| | Missoula | $82,000.00 | $[. . .] |
| The offeror's price of 6,009,580.00 does not appear realistic | | $7,398,875.39 | $6,009,580.00 |

AR 610.

QCI contends that GSA's reliance on the IGE was erroneous and thus misleading when conducting discussions with QCI for two reasons.  First, QCI argues that "it is common knowledge among contractors that the government estimate is often inaccurate." QCI's Reply at 7 (ECF No. 33). Second, QCI argues that GSA should have given deference to QCI's original proposed price because QCI was an incumbent. *Id.* at 8.

The government and PMI respond that it was not arbitrary and capricious for GSA to raise concerns with QCI's price based on a comparison of QCI's prices with the IGE. PMI asserts that QCI's statement that the IGE should not be relied on because it is "inaccurate" is not supported by any evidence. PMI's Reply at 4-5 n.2 (ECF No. 35). The government argues that agencies are not required to give deference to an incumbent's

proposed price. *See* Def.'s Reply at 4-5 (ECF No. 34) (citing *Lyon Shipyard, Inc v. United States*, 113 Fed. Cl. 347, 357 (2013)).

The court agrees with the government and PMI that GSA was not arbitrary or capricious in raising concerns regarding QCI's initial price based on a comparison of QCI's prices with the IGE. While it is true that discussions that rely upon incorrect information that prejudice the offeror are misleading, *Caddell Constr. Co.*, 125 Fed. Cl. at 45-45, QCI has not offered any support for its contention that the IGE was inaccurate beyond the conclusory statement that it is common knowledge that IGE's are often inaccurate. This bare allegation is not sufficient to prove that GSA's IGE was not accurate in this case. It is well settled that agency action is entitled to a "presumption of regularity." *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001) ("Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious. . . . The litigant challenging that presumption necessarily bears a heavy burden."). This court has previously rejected a similar argument that the protestor "would have been awarded the contract if the agency had not failed to 'assess the veracity and accuracy of its initial estimates'" after receiving offers where the protestor offered no analysis as to why the IGE was inaccurate. *First Enter. v. United States*, 61 Fed. Cl. 109, 120 (2004) (quotation omitted).[2]  Likewise, QCI has failed to provide any analysis as to

---

[2] To the extent QCI argues that because some offers submitted had a final price below the IGE, the IGE was inaccurate, the court finds this argument unsupported.  Even where *all* the offers

why the IGE is inaccurate here, and its motion for judgment on the administrative record on this ground is rejected.

To the extent that QCI contends that GSA should have relied on QCI's prices as the incumbent, this contention also fails. The court agrees with the government's argument noted above that GSA is not required to give deference to the incumbent's prices. Accepting QCI's argument that its prices as the incumbent are presumptively correct would shift the established burden of proof in a bid protest case from the protestor to the United States whenever the protestor is the incumbent. However, it is axiomatic that in a bid protest the "*protestor* bears the burden of proving that a significant error marred the procurement in question." *Glenn Def. Marine (Asia)*, 720 F.3d at 907 (emphasis added). As a "seasoned contractor" and incumbent with presumable knowledge of the contracting process, QCI had no basis to "assume that [GSA] would evaluate it[s] offer based on [the protestor's] historical task order prices," rather than the IGE. *See Lyon Shipyard*, 113 Fed. Cl. at 357. Moreover, QCI's argument that any deference should be given to its proposed initial price cuts against its challenge to the accuracy of the IGE given that QCI's final proposed price, $7,247,080.00, was within 2.1% of the IGE, $7,398,875.39. AR 610. Clearly, QCI thought that a final price close to the IGE was justified.

---

received are significantly different from the IGE, that fact "is not itself sufficient to establish the reasonableness of the bidders' prices and the unreasonableness of the government's estimate." *See First Enter.*, 61 Fed. Cl. at 120 (quoting *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 733 (2000)).

In sum, the record shows that GSA consistently used the IGE in its internal review of all proposals, discussions with offerors, and its final award decision. QCI has provided no reason to question the legitimacy of the IGE. The court thus concludes that GSA's discussions were not misleading to the extent GSA identified concerns with QCI's price based on GSA's comparison of QCI's prices with the IGE.[3]

## V.   CONCLUSION

For the forgoing reasons, QCI's motion for judgment on the administrative record is **DENIED**, and the government and PMI's cross-motions for judgment on the administrative record are **GRANTED**. No costs. The Clerk is directed to enter judgment accordingly.[4]

---

[3] The court also addresses PMI's argument that, even if GSA's discussions were misleading, QCI's claim must fail because QCI has failed to demonstrate prejudice. *See* PMI's MJAR at 17-18. PMI argues that QCI cannot show prejudice because PMI's initial proposed price was lower than QCI's proposed price and GSA's discussions with PMI included the same language QCI alleges was misleading. *Id.* at 18. PMI contends that in such a circumstance QCI was not prejudiced by any allegedly misleading language. According to PMI, it faced the same choice as QCI regarding whether to raise its prices and therefore, even if the discussions were misleading, PMI would still have gotten the award given that its price was lower and its technical rating was higher. *Id.*

Although it is not necessary for the court to reach this alternative argument, it nonetheless agrees with PMI that QCI cannot show prejudice. As discussed above, a "protestor must show that but for [the alleged] error, the protestor had a substantial chance of receiving a contract award." *Office Design Grp.*, 951 F.3d at 1373-74. Here, it is undisputed that PMI had a superior technical rating to QCI and that PMI's initial proposed price was also lower than QCI's initial proposed price. Thus, PMI's proposal would still be superior to QCI's proposal, even if GSA's discussions with all offerors were misleading. QCI has not shown that absent the alleged error in the discussions QCI could have overcome PMI's lower price and PMI's unchallenged superior technical proposal. For this alternative reason, the court rejects QCI's protest.

[4] The parties were asked to propose redactions prior to the public release of the May 20, 2020 opinion. In evaluating the proposed redactions, there "is a strong presumption in favor of a common law right of public access to court proceedings." *See e.g.*, *In re Violation of Rule 28(d)*, 635 F.3d 1352, 1356 (Fed. Cir. 2011). In addition, the court may exercise its discretion in

21

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

declining redactions that would render the affected document incomprehensible. *Id.* at 1360*; Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 23 n.1 (2010) ("[I]f the court were to accept all of [the] proposed redactions, it would ... result[ ] in a nearly incomprehensible public document."). In light of these standards, the court has accepted some of the redactions proposed to by the parties regarding proposed prices and declined those that render the opinion incomprehensible. The redactions are indicated with a bracketed ellipsis ("[…]").